ELLIS, Judge.
This is a suit by Arthur L. LeBlanc, Jr. against the Permanente Metals Corporation, hereinafter referred to as defendant, and its compensation insurer, Firemen’s Fund Indemnity Insurance Company of San Francisco, California, in which plaintiff is seeking the maximum amount of compensation allowable for a total and permanent disability as the result of an alleged accidental injury while in the employ of the defendant.
Plaintiff alleged that on or about July 19, 1948 while working as a carpenter he injured his back while assisting a fellow employee who was his helper in tilting a wooden concrete mixing box to empty the waste concrete. As a result of the first accident and subsequent injury or aggravation of the first injury, namely, on or about October 22, 1948 and again on or about March 29, 1949, he sustained a ruptured intervertebral disc in the lumbar region of his back.
The defendant denied any accidental injury and any disability as the result of any accident during the course and scope of plaintiff’s employment.
After trial, judgment was rendered dismissing plaintiff’s suit, whereupon a motion was filed which plaintiff labelled as one for a re-hearing, and subsequently plaintiff, through his counsel, filed a supplemental and amended petition “in support of his motion for a new trial filed herein on the 23rd day of February, 1950,” which motion was denied by the trial court, and plaintiff thereafter appealed to this court. As to the motion for rehearing or new trial, we are of the opinion that the trial judge was correct in his refusal of this motion, *682 which was based upon an allegation by-plaintiff that he had obtained additional evidence which was not available to him on the trial of the cause, namely, an examination iby Dr. William A. Wagner, an Ear, Nose and Throat Specialist of New Orleans, on February 27th and March 1st, 1950, and the examination of plaintiff made by Dr. Thomas Campanella of Baton Rouge, Louisiana, the result of said examination being contained in this doctor’s report dated March 17th, 1950.
This case was tried and testimony heard on December 9, 13, 14, 1949, and February 1 and 2, 1950, and in the testimony it is shown that the plaintiff was operated upon by Dr. William A. Wagner in September of 1946, and plaintiff had every opportunity to have this doctor testify or to have taken his testimony. It is shown by the evidence that Dr. Moss M. Bannerman of Baton Rouge, an orthopedic surgeon, examined the plaintiff twice after the termination o,f his employment with the defendant prior to the beginning of the trial. He did not testify in the case, and the letterhead upon which Dr. Campanello made his report of March 17th, 1950 contains the name of Dr. Bannerman and reads as follows:
“Moss M. Bannerman, M. D.
Thomas Campanella, M. D.
Practice Limited to - Orthopedic Surgery”
“1055 Convention St.
Baton Rouge, La.”
There was ample time for the plaintiff to have secured an examination .by Dr. Cam-panello prior to the trial and to have had him testify, particularly since he had been examined by Dr. Bannerman and the two doctors are apparently associated. Furthermore, the report of Dr. Campanello, copied in plaintiff’s motion as an allegation thereof, contains the following diagnosis:
“Chronic backache, possibly due to a chronic lumbo-sacral sprain or a degenerative disc between L-4 and S-l.”
“Comment: Mr. LeBlanc at this time has an acute backache as revealed by the muscle spasm and by the limitation of motion and by the inability to stoop down. This picture is not a clear one, particularly regarding the history changes, tenderness over the spinous process of L-5 and on each side of the body of L-5 plus muscle spasm plus the marked limitation of hyperextension plus the numbness and radiation. All are suggestive of a ruptured nuclear pol-posus. However, due to the fact that the reflexes are normal and the sensory distribution involves the entire extremity and the fact that bending to the left produces pain on the left and bending to the right produces pain on the right it is quite confusing. From the present examination I am not able to rule out the possibility of a ruptured disc. Nor am I able to say this man has a ruptured disc. The diagnosis of a chronic backache is based on the entire picture. Sometimes we see patients with hypertrophy of the ligamentum flavum having this type of picture. This syndrome should be considered on Mr. LeBlanc. However, the diagnosis can sometimes be proven by exploration alone.”
“I think at this time Mr. LeBlanc has a disability of approximately 20 to 30 per cent which is permanent. This is based on the fact that the injuries are of long standing, and his present symptoms and signs at this time appear to be genuine. The findings suggest a chronic low backache as a result of a chronic lumbosacral sprain or some pathology which has not been found as yet, such as a ruptured disc, hypertrophy of the ligamentum flavum or arthritis, which may or may not be related to the injuries sustained.”
“I trust this is the information you desire concerning him. If I can be of further service please let me know.”
Dr. Campanello’s opinion as given in his report would add nothing to the case. The difficulty confronting the Court is the absolute conflicting medical testimony, and Dr. Campanello’s report is not positive.
Pretermitting the question of whether the plaintiff has borne the burden of proof necessary to show that he suffered an accident or accidents as alleged, the most serious question in this case is whether the plaintiff has proven an injury as a result *683 of the alleged accident or accidents of such a nature as to wholly or .permanently disable him, which injury he contends is a ruptured intervertebral disc.
The medical testimony is in irreconcilable conflict. On the one hand we have the testimony of Dr. UnKauf, recognized orthopedist, and Dr. Kirgis, neuro-surgeon, both of whom are connected with Ochsner’s Clinic, New Orleans, Louisiana, and who testified that in their opinion the plaintiff was suffering from an acute ruptured in-tervertebral disc.
On the other hand, we have the testimony of Dr. Howard Karr of New Orleans, who is one of the only two neurosurgeons in Louisiana -certified by the American Board of Neuro-Surgery, the other ¡being Dr. Dean H. Echols. Dr. Karr is positive in his testimony that the plaintiff does not have a ruptured intervertebral disc, and also, Dr. Charles McVea, general practitioner of Baton Rouge, Louisiana, who has had quite a bit of experience with ruptured intervertebral discs and who was the regular doctor of the defendant and -the same doctor who gave the plaintiff his physical examination on December 3, 1946 when he was first employed by the defendant, and who testified that the plaintiff did not have a ruptured intervertebral disc and that he suffered no disabling injury as the result of his alleged accident or accidents. It was Dr. McVea’s opinion, based upon his observation, treatment and examination of the plaintiff from the date of his employment to the date of his termination, June 14, 1949, that plaintiff did not have a ruptured intervertebral disc, that the “pain in his back was a result of the chronic infection he has in his upper respiratory tract, but that working causes his back to hurt him at times, but that the basic cause of his backache is not the working but the toxic absorption he gets from his upper respiratory tract.”
It was stated in Hebert v. Fifteen Oil Company, La.App., 46 So.2d 328, 331, that:
“Finding itself with medical evidence which is confusing and lacking, this court is compelled to reach a decision which will do equity to the parties. The court is not unmindful that, as in'all other civil cases, the plaintiff must prove his case by a -preponderance of the evidence. However, it has been repeatedly held by the Louisiana courts that when medical testimony is too vague, indefinite, confusing or contradictory for the courts to draw upon said evidence for an intelligent conclusion that the court should look to lay testimony and the circumstances surrounding the issues in the case in order to arrive at an equitable conclusion. See Bearman v. Fuller Construction Company, La.App., 148 So. 720; Rogers v. Union Indemnity Company, La.App., 146 So. SOS. The court citing the above cases said in the case of Hennen v. Louisiana Highway Commission, La.App., 178 So. 654, 656: ‘It is thus to be seen that we are confronted with a deplorable and irreconcilable conflict in the testimony of members of the medical profession relative to an important issue in the case. When situations of this kind are at hand, and such are not infrequent, the court must look to the lay testimony and to the other evidence for assistance in its endeavor to- do justice between the parties.’ ”
It is, therefore, necessary and proper that we examine the testimony as to the kind and nature of the alleged accident-or accidents sustained by plaintiff, his medical record, his work record, his demeanor and activities in and out of the -course of his employment, as well as the facts upon which each doctor based his diagnosis.
On or about July 19, 1948 plaintiff, with his fellow employee, Warner Willis, whom the lower court described as an unintelligent, illiterate Negro, were cleaning -out a wooden box which had been used to mix concrete, and after chipping the concrete loose in the box they raised the box from the side in order to tilt it so that the waste could be emptied, and it was during this lifting that plaintiff testified he “noticed a catch in my back. I paid no attention to it, went -on and continued my work and the next day I reported to the dispensary.”' As found by the district judge, “there was no accident in the sense that anything happened that -could be observed by fellow workers, except that sometime after the alleged accident plaintiff complained that he *684 had hurt his back. The testimony of plaintiff’s colored fellow employee is vague as to any details and the only thing he remembered was that plaintiff had hurt his back and was going to the dispensary.”
The plaintiff reported to the dispensary the next day, July 20th, and at that time apparently said nothing with regard to an accident, but the record shows “Stiff back. Rub down-Methyl Salicylate.” It was not until July 27th that he reported any connection between his back pain and the alleged accident on July 19th. On this date the dispensary record shows: “ * * * States back pain has been present since July 19th when he shoveled concrete at #50. Felt catch at time & soreness next a.m. Diathermy. To be seen by Dr. Mc-Vea in A.M.” There is no further notation of any mention of an accident in the dispensary again until October 25, 1948 at which time plaintiff reported to the dispensary and the notation was: “Pain in lumbar region, states he has had it at times since July 19th ’48. Diathermy 30" ASA. Order for light duty.”
In plaintiff’s petition he alleged that on or about October 22, 1948 he was doing straining work all day, pushing a concrete bucket around, puddling concrete down in forms, and “that the following morning when he awoke he was very stiff and could hardly move his body in that the lower part of his back was stiff and sore.” Also, he had some pain in his left leg. In plaintiff’s testimony he stated that this happened sometime in the month of October and, therefore, any definite date alleged could probably be in error, however, on October 25th, as shown above by dispensary records, he attributed his pain at that time to the alleged accident of July, 1948 and he never reported any accident in October other than October 26th reported at the dispensary that his back was painful whereupon he was sent to the Lady of the Lake Sanitarium for an x-ray and to Dr. McVea. There is a notation by Dr. McVea on the Dispensary records of October 27th, 1948 as follows: “Pain in back began after waking up -on Sat. morning N-o history of injury — St. leg raising OK-pain in back on pressure Diathermy-Selicylates — hard bed.” (Emphasis added)
Plaintiff next complained on March 29, 1949 on a visit to the dispensary of a pain in his back due to moving a lavatory. With regard to this, we find on March 31, 1949 a notation made by one of the dispensary attendants as follows: “Heat lamp on back for 30 min. Dr. said back injury is a recurrence from old injury.” Whether this statement with regard to the back injury being a recurrence of an old injury was made by the doctor to the attendant or made by Dr. McVea to the plaintiff and by the plaintiff reported to the attendant is not clear. A notation on the dispensary records made by Dr. McVea on May 11, 1949 that “This is not a plant thing in my opinion but due to recurrence of back pain which is a result of long standing chronic upper respiratory tract infection. He docs hurt back working however,” would negative the idea that the doctor made such a statement to either the attendant or the plaintiff. Dr. McVea in his testimony explained what he meant when he stated, “He does hurt back working however,” in the following statement: “I have thought through this period that Mr. LeBlanc’s pain in his back was a result of the chronic infection he has in his upper respiratory tract, but that working causes his back to hurt him at times, but that the basic cause of his back ache is not the working but the toxic absorption he gets from his upper respiratory tract.”
The medical record of plaintiff shows that from the time he went to work on December 3, 1946 until the termination of his employment on June 20, 1949 was approved he visited the dispensary more than two hundred times for coughs, splinters in his fingers, infected heir follicle back of the neck, earache, nasal congestion, sinus and headaches, muscle strain, small wounds, indigestion, general aches and pains, nausea and other ailments.
The plaintiff, in order to refute the diagnosis of Dr. McVea, testified that he was operated on by Dr. William A. Wagner for correction of the sinus trouble in September, 1946, prior to his employment with the *685 defendant, and that he had had no trouble from sinus after the operation. However, the dispensary record was to the contrary. His first complaint was on February 3, 1947 when he reported to the dispensary complaining of his back and a cold and he went home as he did not feel like working. On March 4, 1947 he reported to the dispensary with a muscle strain of the back, and on March 6 he reported again and the notation shows, “Back still feels weak and he still has a cold.” On July 20, 1948 he reported to the dispensary with a stiff back and was given treatment on July 21st and July 26th. On July 29, 1948 he reported to the dispensary and the notation was that he stated his back felt much better. He made no more complaints with regard to his back until October 25th, although he had visited the dispensary for other ailments during that period a total of fifteen times. After November 1st, 1948 there was no complaint by plaintiff of his back, according to the dispensary records, until March 29, 1949, however, during this period he had visited the dispensary fifteen times.
Plaintiff was seen by Dr. McVea many times during the period of his employment and was examined by this doctor specifically for a ruptured intervertebral disc and none was found. The symptoms, according to Dr. McVea, were not present and the tests were negative. He was also x-rayed and the x-rays were negative and Dr. McVea was firm in his opinion that he had no injury as the result of any accident at the plant which disabled him.
While it is true that the medical testimony is to the effect that one suffering from a ruptured intervertebral disc may feel better one day and worse the next, from the testimony in the present case the plaintiff did not suffer any excruciating pain nor does the record show that he complained of much pain until after he was discharged. After the plaintiff’s termination he secured the services of his present attorneys and was sent to Ochsner Clinic where he was examined by Drs. UnKauf and Kergis who sent him back to Baton Rouge with directions for treatment by Dr. Lobrano. He took traction treatment at the Lady of the Lake Sanitarium for approximately ten days which did not relieve him, whereupon he returned to Ochs-ner Clinic and was given a myelogram test which consisted of injecting a fluid into the spinal cavity and watching its flow. If there was any impediment an x-ray was taken at its location. This test was negative, however, Drs. UnKauf and Kergis expressed very little faith in the test but all the doctors agreed that when it is positive it is certain that there is some impediment and is taken as an excellent indication of a ruptured disc. Dr. Karr testified that this test reduced errors from 40% to approximately 5% but was not infallible, while Dr. McVea was of the opinion that the test was good but that errors were made in interpretation of the test, but that a positive test was a good indication of a ruptured disc.
The history which plaintiff gave to Drs. UnKauf and Kergis is not exactly in accordance with his work record nor the testimony of other employees of defendant in that he lost very little time from his work comparatively speaking, with no ■complaints of any excessive or frequent pains, and performed the ordinary duties for which he was employed, both heavy and light, whereas he stated to the doctors that he was deliberately -placed on light duty and that in March, 1949, while pulling on a cabinet he suffered a severe pain in his lower back with pain down the leg and that he was doing light work and “could just stagger around to do it at times” and that he was advised by the company to take a month off from work. The records of the dispensary do- not verify this, nor does Dr. McVea’s testimony. The record does show that he was advised to take time off from his work because of his attitude and the fact that he was not performing his duties as he should, neither of which had any connection with any claimed accident and resulting injury. Dr. McVea advised him even to move to a dryer climate, and there is no evidence by anyone, including plaintiff, that he just could stagger around in order to do his work.
*686 Although plaintiff attempted to show that he was discharged because he could not properly perform his duties due to his alleged accidents and injuries, it is positively proven that his release was the result of insubordination. In fact, he admits that during the argument with his superior he told him “If you don’t like my work give me my time,” which request defendant granted.
In addition, the record shows that plaintiff competed in rodeos as late as June, 1948, immediately prior to the alleged accident, and did not admit or deny that in the fall of 1948, subsequent to his alleged accident, that he had participated in a rodeo. In the rodeo he would bulldog steers which, as stated by him, required the rider of a horse at a fast speed to leap from the horse onto the horns of a steer, throwing the steer to the ground. Such a performance would be entirely inconsistent, according to the medical testimony, with the activities of a person suffering from a ruptured intervertebral disc. Such a performance could easily, according to the medical testimony, cause a ruptured disc.
It is also shown and plaintiff admits that in December 1948 he contracted to tear down and dismantle a Government warehouse which was estimated to be a building anywhere from 30 to 40 feet in width by 100 to 130 feet in length. Plaintiff, with the help of two colored workers, tore this building down in an exceptionally short period of time, approximately two days. Schultz, who was the maintenance superintendent at defendant’s plant testified that he saw the plaintiff climbing around the building “with a ten inch sledge in one hand and a thirty inch bore in the other, doing a very active job of dismantling the place.” It was necessary for ■him to climb a ladder to get on top of the building and to use heavy tools in connection with the dismantling job.
It is also shown that the plaintiff attended a picnic at Harding Field given by the defendant company on Saturday,'April 16, 1949, and that he came to the picnic on his horse and while there galloped the 'horse around and on one occasion turned the horse too short, causing the horse to trip and fall with him. In addition, it is proven that in December, 1948 he had a barroom fight in which he must have been extraordinarily active as his opponent had to be taken to the hospital for observation. The floor of the barroom was concrete and part of the fight took place there with the plaintiff on top of his opponent striking him.
The evidence in this case up until the time plaintiff was discharged is inconsistent with the symptoms and activities of any person having a ruptured intervertebral disc.
We feel that Dr. McVea’s opinion should be given great weight as he examined this plaintiff when he was first employed by the defendant and also was in frequent contact with him during the three years of his employment. Dr. McVea on many occasions during plaintiff’s employment treated, advised and examined plaintiff, and he was better qualified to evaluate plaintiff’s claims than the other doctors who testified in this case and who based their opinions on what the plaintiff told them and plaintiff’s actions after the termination of his employment.
We are of the opinion that plaintiff has proven an accident within the meaning of the law but has failed to prove that his present disability, if any, had any causal connection with the accident.
It is therefore ordered that the judgment be affirmed.